JACK F. TITTLE and JEAN L. TITTLE, etc., Plaintiffs-
Appellants *v*. FRANK R. HURLBUTT, et al., Defendants-
Appellees

No. 5060

June 2, 1972

RICHARDSON, C.J., ABE, LEVINSON, KOBAYASHI, JJ.,
and KAWAKAMI, Circuit Judge, for MARUMOTO, J.,
Disqualified

OPINION OF THE COURT BY RICHARDSON, C.J.

This appeal arises out of an action filed in the First Circuit Court to recover damages in which appellants alleged that appellees' medical malpractice in the pre-natal and neo-natal care of appellee Jean Tittle and her son Stephen Tittle negligently caused Stephen Tittle to be born with cerebral palsy. Stephen Tittle was born at the Kaiser Foundation Hospital in Honolulu on October 19, 1965. A trial by jury determined whether appellees, or any of them, committed acts of negligence which proximately caused Stephen Tittle to be born with cerebral palsy. The jury returned a verdict by way of special interrogatories in favor of appellees finding that none of the appellees committed any negligent acts. Appellants appeal the judgment based on that verdict.

Appellants raise twelve points on appeal. We believe that only three points merit discussion.

I

The first issue is whether lack of a state license to practice medicine by itself constitutes evidence of negligence.[1] We believe it does not.

Appellee Dr. Hurlbutt at the time he delivered Stephen Tittle had met all of the statutory qualifications necessary to procure a license except that of the one-year durational residency requirement. Since he was a diplomate of the

---

[1]Appellees objected to the following question by appellants:
   Doctor, assume with me that at the time of the labor and delivery in this case the attending obstetrician, while board-certified, was not licensed to practice in this state but was acting under the then provisions of the statute as an agent, as a matter of good medical practice in Honolulu in 1965 should his sponsor or the person—the doctor for whom he was acting as an agent, have allowed him to do this delivery without being present?
   [The trial judge responded:]
   The objection will be sustained as to reference to the fact of licensing or unlicensing. . . . Questions as to whether there should have been any communication between the attending obstetrician and the actual delivering obstetrician will be allowed, but not with reference to any licensing or unlicensing fact

National Board of Medical Examiners, the necessity of an examination administered by the State of Hawaii was obviated. Dr. Hurlbutt's working experience in the medical profession, prior to acquisition of his Hawaii license in August, 1966, is considerable. Subsequent to graduation from medical school in 1943 and completion of his internship and residency, he served in the Navy where he was director of the Outpatient Department of the Newport Naval Hospital. Following that, the doctor entered private practice in obstetrics and gynecology in Connecticut. After six years, he moved to San Francisco where he served as attending physician in obstetrics and gynecology in the Kaiser Permanente Medical Group, a division of the Kaiser Medical Care Program for twelve years. In 1965, he moved to Hawaii where he remained in association with the Kaiser program.

The trial judge's refusal to allow appellant to establish negligence solely by reason of Dr. Hurlbutt's lack of a license to practice medicine was proper. We hold that the absence of a Hawaii license to practice medicine is immaterial in determining whether a defendant physician exercised proper care in the treatment of his patient where the defendant physician administered patient care under the direction of a licensed physician, as provided by law, and had satisfied all requirements necessary to obtain a license in this state except that of the durational residency requirement. It is the manner in which the services in treatment of a patient are performed that is determinative. *See Starr v. Fregosi,* 370 F.2d 15, 19 (5th Cir. 1966); *McDonald v. Foster Memorial Hospital,* 170 Cal. App.2d 85, 93-94, 338 P.2d 607, 611-12 (1959); *Bute v. Potts,* 76 Cal. 304, 305, 18 P. 329 (1888).

In the present case, Dr. Hurlbutt, at the time of his delivery of Stephen Tittle, was administering patient treatment "under the direction of a physician regularly licensed in the State", in compliance with state law.[2]

---

[2]HRS § 453-3(3) allows one to administer patient care without a permanent license provided that person acts "under the direction of a physician regularly licensed in the State . . . ."

Further, absence of a license is immaterial in determining negligence by reason of an additional factor operative in the present case. Prior to his delivery of Stephen Tittle, appellee Hurlbutt had practiced medicine in his field of specialization no less than eighteen years in two different jurisdictions. Especially in light of the considerable extent of Dr. Hurlbutt's previous professional experience as a licensed physician, it would have been absurd to measure his skill by his non-licensed status in Hawaii. He had satisfied all statutory requirements for an Hawaii license save that of the then established one-year durational residency provision.[3] The traditional bases for such durational residency requirements include: (1) the opportunity for observation of moral character afforded by residence; (2) furtherance of high ethical standards after practice begins, when members of the profession develop a continuing interest and acquire a stake in the community. We find it unnecessary to comment on the constitutional soundness, or lack thereof, of these bases, but mention them because they constituted the underlying justification for the durational residency requirement effective at the time of the trial of the present case. They do not constitute supportable grounds for measuring Dr. Hurlbutt's skill by his non-licensed status.

First, prior to Dr. Hurlbutt's arrival in Hawaii in 1965, his moral character had been scrutinized and attested to by the jurisdictions in which he had practiced. The fact of prior investigation of one's moral character by other jurisdictions does not automatically dispense with this State's obligation to investigate, but is highly probative in establishing

---

Appellants established that appellee Hurlbutt was acting under the supervision of appellee Dr. McCallin. Appellants claim, however, they should have been permitted to show appellees breached their statutory duty by showing that appellee Hurlbutt was not in fact being properly and adequately supervised by appellee McCallin. This claim is groundless as they were in fact allowed by the trial judge to pursue their line of inquiry. See the trial judge's response in footnote 1.

[3]We note that the requirement provided for in HRS § 453-4(2) has since been declared unconstitutional by the U.S. District Court for the District of Hawaii. Montgomery v. Quisenberry, Civil No. 71-3447 (D. Haw., filed April 17, 1972).

the existence of sound moral character. Second, that the Kaiser Medical Care Program has a continuing interest and stake in the island community is clear; and Dr. Hurlbutt's association with their program for twelve years, prior to moving to Hawaii, serves to satisfy the second basis of the residential requirement.

Appellants' reliance on *Correira v. Liu*, 28 Haw. 145 (1924) is misplaced. In *Correira*, the court held that a bailor automobile owner is liable to a third person if the bailor's breach of his statutory duty and his bailee's incompetence together are the proximate cause of injury to the third person. The bailor breached his statutory duty by reason of bailment of his automobile to a bailee not licensed by law to operate a motor vehicle. Operation of a motor vehicle without a license was a misdemeanor and, hence, the court found absence of a license constituted evidence from which incompetence could be inferred. In the present case, appellee Dr. Hurlbutt's care of patients without a license but under the direction of a licensed physician was authorized by law.[4] Hence, Dr. Hurlbutt's non-licensed status contained no probative value as to the issue of negligence.

## II

The second question is whether the trial judge erred by reason of his refusal to give four specific instructions requested by appellant, each of which specified appellee's failure to perform certain acts as negligence. We believe the trial judge properly exercised his discretion in refusing to give these instructions.

The function served by jury instructions is to inform the jury of the law applicable to the current case. The boundaries of the trial judge's discretion in performing this function are defined by the obligation to give sufficient instructions and the opposing imperative against cumulative instructions. However, "[i]f any policy is to be preferred, it is that of

[4]See footnote 2.

allowing adequate and thorough instruction to be given", if they can be given without undue prejudice or confusion. *Barretto v. Akau*, 51 Haw. 383, 399, 463 P.2d 917, 926 (1969). The trial judge does not exceed the limits of his discretion by reason of his refusal of a requested instruction which is substantially covered by other instructions, even when the refused instruction is a correct statement of the law. *Carson v. Saito*, 53 Haw. 178, 180, 489 P.2d 636, 637 (1971); *Ashford v. Thos. Cook & Son (Bankers) Ltd.*, 52 Haw. 113, 122, 471 P.2d 530, 536 (1970); *Gibo v. City and County of Honolulu*, 51 Haw. 299, 304, 459 P.2d 198, 201 (1969); *Kometani v. Heath*, 50 Haw. 89, 98, 431 P.2d 931, 938 (1967); *Collins v. Shishido*, 48 Haw. 411, 418-19, 405 P.2d 323, 328 (1965); *State v. Heirs of Kapahi*, 48 Haw. 101, 108, 395 P.2d 932, 937 (1964); *Estate of Ching*, 46 Haw. 127, 129, 376 P.2d 125, 127 (1962). In *Barretto v. Akau, supra* at 395-98, this court in elucidating the confines of the trial judge's discretion, indicated that the repetitious instructions should be avoided by striving to reduce the number of instructions given and to give a fair and complete single instruction on each issue.

In the present case, the trial judge was operating within the ambit of his discretion. He properly ruled that instruction Number 15[5] substantially encompassed the four instructions requested by appellant.[6] In addition, the requested instruc-

---

[5]Instruction Number 15 reads:

It is the duty of a physician or surgeon who holds himself out as a specialist in a particular field of medical, surgical or other healing science, to have the knowledge and skill ordinarily possessed, and to exercise the care and skill ordinarily used by specialists in good standing practicing the same field under similar circumstances.

A failure to perform such duty is negligence. However, such a specialist is not negligent simply because his efforts prove unsuccessful. It is possible for him to err in judgment or to be unsuccessful in his treatment or care without being negligent.

[6]Appellant's requested instructions read:

*Plaintiff's Instruction No. 38:* If you find from a greater weight of the evidence that the symptoms and physical conditions existing in the plaintiff JEAN TITTLE were such as to require a careful and prudent physician and surgeon to make further investigation, or more and different tests before making a diagnosis,

tions are precariously akin to the type of instructions proscribed by this court because they single out and unduly emphasize certain facts. *Gelber v. Moana Hotel,* 49 Haw. 327, 331, 417 P.2d 638, 640 (1966); *Collins v. Shishido, supra* at 418. The injustice which this rule seeks to avoid is the misleading of the jury into thinking that because the court has specifically referred to these facts, the court believes them to be true. Because the subject requested instructions bear a precariously close resemblance to this prohibited type of instructions, the trial judge did not abuse his discretion in refusing to give the requested instructions.

---

and if you find from the evidence that as a direct and proximate result of such failure, if any, the plaintiff JEAN TITTLE received improper or inadequate treatment and as a result thereof plaintiffs were injured, then, if you so find, the defendants are guilty of malpractice.

*Plaintiff's Instruction No. 39:* If you find from a greater weight of the evidence: (1) that an obstetrician of ordinary skill and ordinary care, and practicing at the time in question would, under the same circumstances, as shown by the greater weight of evidence in this case, have referred the plaintiffs to a specialist in internal medicine; (2) that the care required and needed by the plaintiffs at the time in question was such as to require the attention of such a specialist; (3) that there was such a specialist available; (4) that the defendants failed to recommend or to refer the plaintiffs to such a specialist; and (5) that the failure to refer the plaintiffs to such a specialist caused injury to the plaintiffs; then, if you find all of these things from a greater weight of the evidence, you may find the defendants guilty of negligence.

*Plaintiff's Instruction No. 40:* You are instructed that a physician and surgeon who properly diagnoses an ailment or condition, but who thereafter negligently fails to treat the same, or who thereafter negligently gives improper treatment, is liable for all damages and injuries which proximately result from his failure to treat the condition, or from his failure to render proper treatment.

*Plaintiff's Instruction No. 42:* You are instructed that a physician owes a duty to anticipate emergencies which may reasonably be expected to arise during treatment, and to make reasonable preparations for meeting any emergency that may reasonably be expected to arise. Just what may be reasonable in this respect depends upon the circumstances of the case, and the requirement is governed by the rule that a physician is required to have and exercise that degree of knowledge, skill and care that is had and exercised by reputable physicians practicing in the same field at the same time, and under like or similar circumstances and conditions. In this case, if you find from the evidence that a reputable physician, under like or similar circumstances, would have reasonably foreseen that an emergency might or could arise during the course of treating the plaintiffs, then the failure of the defendants to make reasonable provisions for such emergency, if there was any such failure, would constitute negligence.

## III

The final question is whether a medical witness may be rehabilitated on redirect examination through use of medical treatises. We believe the trial court did not abuse its discretion in prohibiting employment of medical texts for the purpose of rehabilitating one's own witness.

Appellants called Dr. Francis Soon as a medical expert. Throughout direct examination and cross-examination, Dr. Soon made frequent references to medical studies, some of which are contained in medical treatises and journals to support his testimony. On cross-examination, appellees tested the validity of the doctor's medical opinions by referring to studies contained in medical texts and reviews. On redirect examination, appellant referred to a medical article with which the doctor was not altogether familiar and which he apparently had not relied upon to form his medical opinion. The article was offered for the sole purpose of reaffirming Dr. Soon's testimony. The court sustained appellees' objection to this line of redirect examination.

Much controversy has centered around the use of medical treatises on cross-examination to test the reliability of expert medical witnesses. *See Ruth v. Fenchel*, 37 N.J. Super. 295, 117 A.2d 284 (App. Div. 1955); 38 TENN. L. REV. 449 (1971); 6 J. WIGMORE, EVIDENCE § 1700 (3d ed. 1940); 3 B. JONES, LAW OF EVIDENCE § 622 (5th ed. 1958). However, relatively little attention has been focused on the use of medical texts on redirect examination for the purpose of rehabilitation. The established view prohibits the use of medical treatises for the purpose of rehabilitating a witness but permits use of such books for clarification of misunderstandings which may arise out of use of the texts on cross-examination. In *Seattle–First National Bank v. Rankin*, 59 Wash. 2d 288, 294-95, 367 P.2d 835, 839-40 (1962), the Supreme Court of Washington stated:

It is true that, on redirect examination, the books could not be employed for the purpose of rehabilitating a witness who already had been discredited by their use.

However, their use was proper in order to explain certain passages which were read before the jury and to clarify possible misunderstandings by the jury which might have resulted from the defendant's use of the books on cross-examination. Upon examination of the record, it does not appear that the plaintiff's counsel exceeded these bounds in his use of the treatises. The matter was within the discretion of the trial court. (Citations omitted.)

We believe, too, that determination of this issue lies within the realm of the trial court's discretion. Examination of the record leads us to conclude that the trial judge properly exercised his discretion in this matter. Throughout direct examination and cross-examination, Dr. Soon made extensive references to medical studies for the purpose of buttressing his position. The trial court did not abuse its discretion in imposing a reasonable limit on the use of medical texts.

This court recognizes the wisdom of enlarging the scope of use of medical texts on cross-examination. *See Ruth v. Fenchel, supra;* 6 J. WIGMORE, EVIDENCE § 1690 (3d ed. 1940); 38 TENN. L. REV. 449 (1971). Wider use of medical texts on cross-examination should necessitate a like enlarged use on redirect examination. However, it is the trial judge's function to exercise his discretion in regulating such use. In the present case, the trial court properly exercised his discretion.

The judgment is affirmed.

*Frank D. Padgett (Padgett Greeley Marumoto & Steiner* of counsel) for plaintiffs-appellants.

*Richard K. Quinn (Anthony Hoddick Reinwald & O'Connor* of counsel) for defendants-appellees.