*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCAP-15-0000599
16-OCT-2017
09:19 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---oOo---

DOUGLAS LEONE and PATRICIA A. PERKINS-LEONE,
as Trustees under that certain unrecorded Leone-Perkins
Family Trust Dated August 26, 1999, as amended,
Plaintiffs-Appellants/Cross-Appellees,

vs.

COUNTY OF MAUI, a political subdivision of the
State of Hawaiʻi; WILLIAM SPENCE, in his capacity as
Director of the Department of Planning of the County of Maui,
Defendants-Appellees/Cross-Appellants.

SCAP-15-0000599

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CAAP-15-0000599; CIVIL NO. 07-1-0496(2))

OCTOBER 16, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY NAKAYAMA, J.

## I.   INTRODUCTION

Over seventeen years ago, Plaintiffs-Appellants/Cross-Appellees Douglas Leone and Patricia A. Perkins-Leone

(collectively, the Leones) bought a beachfront lot in Makena, Maui with the expressed intent of building a family house on it. Today the house has not yet been built, and the Leones contend that the County of Maui's land use regulations and restrictions prevented them from doing so.  In 2007, the Leones filed suit against Defendants-Appellees/Cross-Appellants County of Maui and William Spence, in his capacity as Director of the Department of Planning of the County of Maui (collectively, the County), asserting, among other counts, that the County's actions constituted a regulatory taking for which the Leones were entitled just compensation.  On May 5, 2015, a jury delivered a verdict in favor of the County.

This case requires this court to decide, inter alia, whether the County's land use regulations constituted a regulatory taking of the Leones' property.  But we do not decide on a blank slate.  The jury determined that the County did not deprive the Leones of economically beneficial use of their property.  We conclude that there was evidence to support the jury's verdict in favor of the County.  As such, we affirm the Circuit Court of the Second Circuit's (circuit court):  1) June 1, 2015 judgment in favor of the County and against the Leones, 2) August 5, 2015 order denying the Leones' renewed motion for judgment as a matter of law or, in the alternative, motion for a new trial, and 3) August 5, 2015 order granting in part and

denying in part the County's motion for costs.

## II.  BACKGROUND

In 1996, the Maui County Council (county council) adopted Resolution No. 96-121, authorizing the Mayor to acquire nine beach lots at Palauʻea Beach in Makena, Maui for the creation of a public park.  The county council noted that Palauʻea Beach was "one of the last undeveloped leeward beaches on Maui" and that the community supported the creation of a beach park.  Because of budgetary constraints, the County was able to buy only two of the nine lots (Lots 18 and 19), and the seven remaining lots were sold to private individuals.

The beach lots were subject to the following regulations and designations:

1)  The 1998 Kihei-Makena Community Plan (the community plan), which designated the lots as "park" land.  Maui Cty., Kihei-Makena Community Plan 59 (1998).  This designation "applies to lands developed or to be developed for recreational use."  Id.

2)  A Special Management Area (SMA) designation pursuant to the Hawaiʻi Coastal Zone Management Act (CZMA).  Any development within an SMA is prohibited unless the developer applies for and receives an SMA permit.[1]  Hawaiʻi Revised

---

[1]      More specifically, under the CZMA, "development" does not include the "[c]onstruction of a single-family residence that is not part of a larger development."  HRS § 205A-22 (2001).  However, if the "authority finds that any excluded use . . . may have a cumulative impact, or a significant
(continued...)

3

Statutes (HRS) §§ 205A-21 and 205A-26 (2001).

3) A "Hotel-Multifamily" zoning designation, which permits, <u>inter alia</u>, the building of single-family residences.

4) A Declaration of Covenants and Restrictions (the declaration), which states, "[a] lot shall be used only for single family residential purposes regardless of whether the applicable zoning would permit a more intensive or different use."

In February 2000, the Leones bought one of the lots ("Lot 15" or "the property") for $3.7 million. The Leones initially relisted the property for $7 million and, in 2002, they received two offers for its purchase,[2] which the Leones refused.

Four years after buying Lot 15, the Leones hired a land use planning firm, Munekiyo & Hiraga, Inc. (Munekiyo), to prepare a draft environmental assessment (DEA) of Lot 15 so that they could eventually apply for SMA and development permits to build a single-family residence. As part of the environmental assessment process, Munekiyo sent out an early consultation letter, seeking comments from governmental agencies and non-profits on the Leones' proposed development of Lot 15. In this letter, Munekiyo

---

[1](...continued)
environmental or ecological effect on a special management area," then the excluded use, including the construction of a single-family residence, "shall be defined as 'development' for the purpose of this part." HRS § 205A-22.

[2] The offers were for $4.5 million and $4.6 million.

described the property and the development plan as follows:

> The parcel is located within the "Urban" district, is zoned Hotel "H-M" by the County of Maui and is designated as "Park" under the Kihei-Makena Community Plan.  The owner intends to file a community plan amendment and change in zoning application with the County of Maui, Department of Planning for review by the Maui Planning Commission, and final action by the Maui County Council to achieve land use consistency for the parcel.  Since a community plan amendment will be sought, the applicant will submit a Draft Environmental Assessment (DEA) in accordance with Chapter 343, Hawaii Revised Statutes (HRS).

On May 20, 2004, the County of Maui's Department of Planning (the Department) sent Munekiyo comments in response to the early consultation letter.  The Department initially noted that "the proposed action requires a Community Plan Amendment which therefore triggers Chapter 343, HRS."  The Department then provided the following comments:

> 1.  Provide a view analysis from Makena-Keoneolo Road.  The analysis should assume a 60% buildable area and 40% open view corridor for the property and address impacts of the structure's massing.
> 2.  The Erosion Rate for the Property is approximately one foot per year.  As such, the shoreline setback area is calculated as 60 feet from the certified shoreline.
> 3.  Lateral access along the shoreline shall be provided.
> 4.  In addition to the applications for a Community Plan Amendment and Change in Zoning, the proposed action requires a Special Management Area assessment.

On June 3, 2004, the Leones directed Munekiyo to stop work on the project.  In an intra-office email, Munekiyo explained why the Leones instructed the firm to halt work on the project:

> I received a call from Doug Leone this morning.  He asked that we stop work and close the project.  He felt that the political climate is much too difficult to be seeking any land use entitlements for the property.  He was not willing to accommodate a 40% road frontage view corridor and felt that it would be better for him to just hold on to the

5

property for now.

In 2007, the Leones restarted the permitting process and Munekiyo submitted the SMA assessment application to the Department on September 28, 2007.  One month later, the Department sent a letter declining to process the SMA application with the following explanation:

> The subject property is designated "Park" on the Kihei-Makena Community Plan (Community Plan).  The proposed Single-Family dwelling is inconsistent with the Community Plan.  An application for a Community Plan Amendment was not submitted concurrent with the subject application.
>
> Section 12-202-12(f)(5) states that an application "cannot be processed because the proposed action is not consistent with the County General Plan, Community Plan, or Zoning, unless a General Plan, Community Plan, or Zoning Application for an appropriate amendment is processed concurrently with the SMA Permit Application."

The letter further explained that, in order for the Leones to proceed, they would have to file a new application consistent with the community plan and with the appropriate submittals.

## A.   Initial Circuit Court Proceedings[3]

On November 19, 2007, the Leones filed a lawsuit against the County, alleging that, because of the County's actions, the Leones were left with no economically viable use of their property.  The Leones brought five counts against the County:  1) inverse condemnation pursuant to article I, section 20 of the Hawaiʻi Constitution, 2) inverse condemnation pursuant to the Fifth and Fourteenth Amendments of the United States

---

[3]     The Honorable Joseph E. Cardoza presided over the initial circuit court proceedings.

Constitution, 3) equal protection violation pursuant to 42 U.S.C. § 1983, 4) substantive due process violation pursuant to 42 U.S.C. § 1983, and 5) punitive damages under 42 U.S.C. § 1983. The Leones asserted that the County was required to provide the Leones with just compensation for their property, and that they were also entitled to punitive damages in the amount of $50 million.

The County filed a motion to dismiss, which the circuit court granted on March 2, 2009. The circuit court determined that "there [were] effective remedies still available" to the Leones, such as proceeding with a new application with appropriate submissions, seeking an amendment to the community plan, or applying for a special management use permit pursuant to the provisions of HRS §§ 12-202-13 and 12-202-15. Because "effective remedies" were still available to the Leones, the circuit court concluded that the Leones had "failed to exhaust their administrative remedies." As such, the circuit court ruled that the case was "not ripe for adjudication" and that the circuit court lacked jurisdiction over the subject matter of the case.

## B. Initial ICA Proceedings

The Leones appealed this decision and on June 22, 2012, the Intermediate Court of Appeals (ICA) published an opinion which vacated the circuit court's judgment and remanded the case

7

for further proceedings.  See Leone v. Cty. of Maui, 128 Hawaiʻi 183, 284 P.3d 956 (App. 2012) (Leone I).  The ICA concluded that the circuit court erred in determining that it lacked subject matter jurisdiction because the Leones' claims were not ripe for adjudication.  Id. at 196, 284 P.3d at 969.  The ICA specifically determined that the Department's letter, which declined to process the Leones' SMA assessment application, satisfied the finality requirement for ripeness, and that the Leones were not required to seek a change in the community plan, which amounted to seeking a change in the existing law, before they could bring their inverse condemnation claims.  Id. at 193-96, 284 P.3d at 966-69.

Of import to the proceedings on remand, the ICA commented in a footnote on the inconsistencies of the Maui County permitting process:

> [T]he proposed use - the construction of single-family residences - is not considered a "development" under the CZMA unless the authority finds a cumulative impact or significant environmental effects.  HRS § 205A-22.  Although the CZMA does not expressly require consistency for proposed land uses that are not considered "developments," the Maui County Code (MCC) renders the Community Plan binding on all county officials.  MCC 2.80B.030(B)(2006).  Under the express language of the code, neither the director nor the Planning Commission may approve land uses that are inconsistent with the Kihei-Makena Community Plan.  The language of the SMA Rules comports with this outcome, stating in mandatory terms that "the director shall make a determination . . . that the proposed action either: . . . (5) Cannot be processed because the proposed action is not consistent with the county general plan, community plan, and zoning[.]" SMA Rule 12-202-12(f) (emphasis added).  In any case, the Director's decision that Appellants' assessment applications could not be processed had the same effect as a determination that it was a development.  If, because of a "cumulative impact or a significant environmental or

> ecological effect," a single-family residence is considered
> a development, then an SMA permit would be required.  If a
> permit were required, it could not be approved because it
> would be inconsistent with the Community Plan.  Thus,
> regardless of the denomination of the assessment
> application, the Director's determination of inconsistency
> with the Community Plan precludes further processing under
> applicable law.

Id. at 194 n.8, 284 P.3d at 967 n.8 (alterations in original)
(citations omitted).  Accordingly, the ICA vacated and remanded
the case to the circuit court for further proceedings.  Id. at
196, 284 P.3d at 969.[4]

## C.    Circuit Court Proceedings on Remand[5]

A jury trial was held from March 30 through May 5, 2015
on the same five counts.[6]  During opening statements, the Leones
showed the jury a tax map that depicted the Palauʻea Beach
properties and explained who owned them and how they were
developed:

> And these are the present owners of properties.  The
> north end of the beach you have Mr. Sweeney and Mr.
> Lambert's properties.  They have homes on them today, and
> the reason why they have homes on them, we'll explore in
> more detail.
>     This is the Leones' property.  It has a path on it
> leading from Old Makena Road to the beach that is used every
> day by members of the public.
>     This is the Larsons' properties.  These two lots are
> owned by Bill and Nancy Larson.  This parcel, Lot 52, is now
> being built upon, and the reasons why Mr. Larson got

---

[4]    On October 29, 2012, the County applied for a writ of certiorari
to this court, which was denied on December 12, 2012.  Leone v. Cty. of Maui,
No. SCWC-29696, 2012 WL 6200401 (Haw. Dec. 12, 2012).

[5]    The Honorable Peter T. Cahill presided.

[6]    Prior to the start of the jury trial, the circuit court entered an
order granting the County's motion for summary judgment as to Count V of the
Leones' complaint, which asserted a claim for punitive damages pursuant to 42
U.S.C. § 1983.  As such, only counts I-IV proceeded to the jury trial.

> approval to build on his property we'll go in to also.
> These two lots in the middle of the beach are owned by the County.  The County bought them for beach-park purposes back in the end of 1999, but never improved the property. . . .
> This property is owned by Mr. Altman.  This next property is owned by an associate of Mr. Leone's named Dan Warmhoven, Galando, and Luzco, and these three properties are on the rocky point at the south end of the beach, and they're improved with homes on them today.

According to the Leones, the shifting political climate on Maui was the reason why some landowners at Palauʻea Beach were allowed to build homes on their properties, while the Leones were denied that same right:

> Under Mayor Apana's administration, some of the other lot owners were able to get those approvals.  They got SMA Assessment Applications filed.  The exemptions were granted by Planning Director Min, building permits were issued, and they went forward and started building their homes; Lambert and Sweeney among others.
> After Mayor Arakawa took office, during his first administration, he appointed a new Planning Director named Michael Foley, and within eight days after taking office, Planning Director Foley announced there would be no more approvals for homes at Palauea Beach and stopped granting extensions at Palauea.

The Leones contended that it was at that time that they sought to obtain permits for building a single-family residence on their property, after Mayor Arakawa took office and the new Planning Director decided to stop development at Palauʻea Beach.  The Leones further explained that after Mayor Arakawa took office for the second time, the policy shifted again, but it was too late for the Leones to build at that point:

> Now, after Mayor Arakawa takes office for the second time, the political winds shift again, and beginning in 2012, the current Arakawa administration begins granting approvals to some of the other lot owners to build.
> The problem from the Leones' perspective is that in September of 2011, there was a 40-year storm off of New

> Zealand, which came up over the coastal dunes and into their property and left debris much further inland than it had been before. The debris line creates a shoreline, and since the debris line came so much farther inland than it had before, the Leones were unable to build.[7]

As such, the Leones contended that the "effect of the County's actions was to deprive the Leones of all economically viable use of their land."

For its part, the County presented the following opening argument:

> The County submits that the evidence in this case is not going to show that the Leones were denied the right to build on their lot. The evidence in this case is going to show that they did not want to go through the same process, the difficult process that each of the other seven lot owners out here who have single family residences on their lot went through. That's why we're here today.
>
> . . . .
>
> Regulations are not inflexible. We've got seven other lot owners out there who are, again, living in very luxurious single family homes. They dealt with these regulations. They built on the lot. There's a guy out there building now.

The testimony during trial focused almost exclusively on two distinct but interrelated inquiries: 1) whether the County's regulations prevented the Leones from building a single-family residence, and 2) if so, whether this deprived the Leones of economically beneficial use of their property. As to the

---

[7] The Leones contended that they applied for a shoreline certification on January 10, 2014, but that they were informed by the Department of Land and Natural Resources (DLNR) of this court's recent opinion in Diamond v. Dobbin, 132 Hawaiʻi 9, 29, 319 P.3d 1017, 1037 (2014), which required DLNR to "consider historical evidence" in making its shoreline determination. The Leones contended that, because of the 2011 storm and this court's decision in Diamond, the shoreline setback on the property would have overlapped the front yard setback, leaving no buildable area on the property. At this point, the Leones withdrew their shoreline certification application.

11

first query, the circuit court ultimately instructed the jury

that the County's actions had prevented the Leones from building

a house on their property:

> Ladies and gentlemen, at an earlier point during the trial, I read to you the law as you must apply in this case. I'm going to read three additional portions of the law that you must apply to the facts of this case.
>
> The first instruction to you is as follows:  Following an appeal at an earlier stage of this case, the Hawaii Intermediate Court of Appeals issued an opinion entitled Leone, et al., vs. County of Maui, et al.  That opinion is the law of this case and is binding on the parties and this Court.
>
> Second instruction.  In the Leone opinion, the Intermediate Court of Appeals stated as follows:  The language of the SMA Rules state in mandatory terms that the Director shall make a determination that the proposed action either cannot be processed -- actually that's either, five, cannot be processed because the proposed action is not consistent with the County General Plan, Community Plan, and Zoning.  That's SMA Rule 12-202-12, subparagraph F.
>
> In any case, the Director's decision that the Leones' Assessment Applications could not be processed has the same effect as a determination that it was a development.  If, because of a cumulative impact or a significant environmental or ecological effect, a single family residence is considered a development then an SMA permit would be required.
>
> If a permit were required, it could not be approved because it would be inconsistent with the Community Plan. Thus, regardless of the denomination of the Assessment Application, the Director's determination of the inconsistency with the Community Plan precludes further processing under applicable law.
>
> The final instruction at this point of the case is as follows:  Under the Maui SMA Rules, the Planning Director may not legally process an application for an SMA exemption for a land use that is inconsistent with the Kihei-Makena Community Plan.

(Formatting altered.)  These rulings shifted the parties' focus

to the second inquiry:  whether the County's regulations deprived

the Leones of economically beneficial use of their property.

Both parties called expert witnesses to testify as to

the use and value of the Leones' property.  The County called Ted

Yamamura (Yamamura), a real estate appraiser with over thirty-

five years of experience appraising Maui real property, to testify on the value and use of the Leones' property.[8]  At the outset, Yamamura testified that he has done thousands of real estate appraisals on Maui over decades and that he determines the "best uses" for the real estate in doing an appraisal.  Yamamura explained the test that he uses for determining highest and best use:  "There's a four-item test; that use must be legally permissible, physically possible, financially feasible, and maximally productive, which means that use will yield the highest value for that land."

Counsel for the County then asked Yamamura about investment use:

> [COUNTY:] Mr. Yamamura, let me start by asking, what is meant by investment in land?
> [YAMAMURA:] It's the use of land as an investment tool.  In other words, people would buy land, hold it for a period of time, and as it increases in value and depending on the buyer's strategy and financial objectives, sell it for profit.
>
> . . . .
>
> [COUNTY:] Do you have an opinion as to whether investment is a use of land?
>
> . . . .
>
> [YAMAMURA:] I consider investment as a bona fide use of land.  It happens all the time.  People by [sic] land, hold on to it; after it appreciates over time, people sell it for profit.  I think that's a bona fide land use.
>
> . . . .

---

[8]      Prior to trial, the Leones filed a motion to exclude or limit Yamamura's testimony on the basis that he was not qualified to opine on "economically viable use."  The circuit court granted in part and denied in part this motion, explaining that Yamamura could not testify on the current value of the property.

> [COUNTY:] In your opinion, Lot 15 at Palauea -- based on your analysis of Lot 15 at Palauea, does it have potential use as an investment?
>
>           . . . .
>
> [YAMAMURA:] Absolutely, yes.
> [COUNTY:] And looking at the first factor of your analysis, which is legally permissible, why do you draw that conclusion based on that particular factor?
>
>           . . . .
>
> [YAMAMURA:] Legally permissible.  It's -- the underlying Zoning of that lot is HM.
> [COUNTY:] Meaning?
> [YAMAMURA:] Hotel.
> [COUNTY:] Hotel.
> [YAMAMURA:] But there's a conflict in the Community Plan, but if -- under the context of legally permissible, if the issue of that conflict can be mitigated, then we can look at it as being a legally permissible use in the context of highest and best use because that issue or that conflict can be mitigated.

The circuit court overruled the Leones' objections to this testimony.

Rick Tsujimura (Tsujimura), a real estate attorney, testified as an expert witness for the Leones.  Tsujimura opined that the inconsistences between the community plan and the zoning requirements left the Leones "deprived of all economically beneficial use for that lot."  Tsujimura explained:

> The Community Plan is designated park.  On the Zoning it's hotel, multi-family.  So as you can see, there's an inconsistency between those two.  They don't line up.
>       The original intent of the State Plan, the State land use, the General Plan, the Community Plan was for all of this to line up and, consequently, what has happened is we're in a situation, because of this inconsistency, when the Leones come in for an SMA permit -- Assessment Application, part of the law, both at the State level and Chapter 205A and the County SMA law in Chapter 12-202-12, it requires that these pieces align.  And when they don't, when they're not the same, these all end up causing the Assessment Application to be denied.
>       And this is the problem for the landowner right now.  Because of this inconsistency, this prevents the Leones from

14

doing anything to start the process to do anything with the lot, no matter what they wanted to do because they can't get past this inconsistency.

So what happens is you're basically left with a piece of property that's zoned for hotel family -- multi-family, Community Plan park, and because of that, you can't do anything. And so there's no economically beneficial use that they can use on that lot because of this.

On cross-examination, Tsujimura explained why he did not consider the property to have any investment value:

[TSUJIMURA:] Investment value is premised upon an ability to use the property, and my opinion, as I've articulated, is that because of the inconsistency between the Community Plan and the Zoning, there is no ability to use the property.

So if you're asking me from an investment perspective, I would say in this particular case, it would be zero because you could never harvest that value given the current situation.

[COUNTY:] So would you disagree with me, then, that there's potential economic benefit in the ownership and possession of a piece of real estate?

[TSUJIMURA:] In a general sense, yes. But specifically to this particular property, no.

[COUNTY:] So are you saying there's no economic benefit in the Leones' lot as a vehicle for an -- as an investment?

[TSUJIMURA:] Not in the current situation because of the inconsistency.

[COUNTY:] Really? Are you familiar with the Doug Schatz' lot at Palauea?

[TSUJIMURA:] No.

[COUNTY:] Are you aware that after Doug Schatz got the very same return -- the same letter returning his application with the same language as the Leones' lot, that he turned around and sold that property to somebody named Altman who's got a house on it today?

[COUNSEL FOR LEONES] Objection; relevance and beyond the scope.

[THE COURT:] Sustained.

Also on cross-examination, the County examined Tsujimura about whether the Leones' property could be used for other purposes, to which Tsujimura conceded that the property could potentially be used for commercial purposes:

[COUNTY:] Mr. Tsujimura, you were asked whether the Leones could engage in commercial sales of concessions on their lot, and I believe you acknowledged that under the hotel district zoning, that they could, in fact, operate a park;

15

correct?

[TSUJIMURA:] Yes.

[COUNTY:] And then you said that they can only engage in noncommercial uses under the hotel zoning, but I'm going to read to you what the hotel zoning ordinance actually says.

And it says, "Permitted uses:" -- this is 19.14.020 -- "Within Hotel Districts, the following uses shall be permitted:  Any use permitted in residential and apartment districts."

Then when you go to 19.08.020, which says, "Permitted uses in Residential Districts," what it actually says, Mr. Tsujimura, is, "Parks and playgrounds, noncommercial: Certain commercial, amusement, and refreshment sale activities may be permitted when under the supervision of the government agency in charge of the park or playground."

Which means a private land owner can engage in these commercial activities, but it's just subject to permitting requirements and regulations under the agency, in this instance, the County; isn't that correct?

[TSUJIMURA:] I agree with you, Mr. Corporation Counsel.  It should have been under the supervision of the County.

[COUNTY:] All right.  And so, in fact, the answer to the question, which you said, as to whether commercial uses would be allowed and to which you answered no, your answer is actually incorrect; right?

[TSUJIMURA:] Well, my answer was that it would be subject to operation by the County.

[COUNTY:] And that's where your answer was incorrect. Because the ordinance which I actually just read to you said under the -- wait.  You got to let me finish -- says under the supervision of the County, not the operation.  That's different; right?

[TSUJIMURA:] Except if you -- as you read it -- it went further to say that the agency would have control over the park, which suggests that it's who controls the park.  If the Leones control the park, it's not controlled by the Parks Department.

[COUNTY:] The word "control" didn't appear anywhere in what I just read --

[TSUJIMURA:] Supervise.

[COUNTY:] -- so I'm going to read it again.  There's a difference between the word "supervise" and the word "control."  Correct?

[TSUJIMURA:] There could be.

[COUNTY:] . . . Isn't what that says, is that the Leones can engage in refreshment sales and certain commercial activities as long as they get the proper permitting from the Department of Planning?  Isn't that what that says?

[TSUJIMURA:] If you can get the proper permitting.  If they intentionally try to put any sort of hard scape [sic] on it, it would lead to, again, this problem with the SMA.

[COUNTY:] So your answer to the question originally was incorrect because a private land owner can, in fact, engage in commercial sale activities on their lot as long as they get the correct permits from the County of Maui; isn't that correct?

[TSUJIMURA:] If it's supervised by the County.

16

. . . .

> [COUNTY:] So subject to permitting and supervision, it's allowed, isn't it?
> [TSUJIMURA:] Yes, if you can get an SMA assessment through.

Dr. William H. Whitney (Dr. Whitney), a real estate economist, also testified as an expert witness for the Leones. As part of his evaluation of the property's economically beneficial use, Dr. Whitney created a speculative real estate investment model for Lot 15, which allowed him to predict the profit value the Leones lost because they were not allowed to develop their property. Dr. Whitney summarized his findings to the jury, and estimated that, if the Leones had been allowed to develop their property, they would have realized a value upwards of $19 million by 2017.

On cross-examination, counsel for the County examined Dr. Whitney about the possibility of using the Leones' property for commercial park uses. Dr. Whitney testified that one of the main factors in determining whether the Leones' property retained economically beneficial use in a commercial context is whether commercial activity is economically feasible. Dr. Whitney explained that he did not fully study whether commercial activities were economically feasible, because he was operating under the assumption that commercial activities were not legally permitted on the Leones' property:

> [COUNTY:] Okay. Let's assume -- and I'm sure you can do this. Let's assume that your opinion on whether parks and playgrounds and certain commercial activities are

permissible at the Palauea lots are incorrect.

Let's assume they are permitted as reflected in the applicable Zoning Codes.

And then let's talk about the second component of your analysis, which is the financial feasibility. And I handed you what was marked as -- what is marked as P-241, which is in evidence, and your testimony yesterday was that, even if you could engage in these activities, they're not going to cover the property taxes, and you said that in 2014 the property taxes were $68,103.63.

So my question to you was, did you do any sort of analysis to determine whether or not the types of activities we're talking about, recreational or amusement, would, in fact, be able to generate $68,103.63, per annum, to cover the property tax?

. . . .

[WHITNEY:] I did not do any analysis. I relied on my judgment, as one who has provided leasing advisory services over the years and done park feasibility studies, and I would say, in my judgment, it's very unlikely that that kind of activity at that location, on my judgement, wouldn't cover the property taxes and perhaps the other costs that the Leones would face; the provision of utilities, security, and other activities that might be necessary to keep the property in good standing.

. . . .

[COUNTY:] Did you do any exploration on Maui to determine how amusement and concession refreshment actually work on the beaches and parks in Maui?
[WHITNEY:] No. No investigation.

. . . .

[COUNTY:] Did you ask anybody on Maui, running that type of concession, how much they're able to generate annually in income?
[WHITNEY:] No.
[COUNTY:] Renting surfboards, renting kayaks, selling refreshments on crowded beaches; you didn't ask anybody that, did you?
[WHITNEY:] No.

Douglas and Patricia Leone also testified at trial. Both testified on direct examination that they bought the property with the expectation of building a single-family home on it. Patricia testified that her family "love[d] Maui, and we thought it would just be great to build a home where our family

18

could come for years -- you know, for years and be together." Douglas similarly testified that he bought the property because he "wanted a dream home for my wife, our four children, and eventually our grandchildren." On cross-examination, Patricia testified that she and her husband, as trustees of the Leone Family Trust, owned eight residential properties in addition to Lot 15 at Palauʻea Beach. Patricia also acknowledged on cross-examination that one of the purposes of the trust was to "invest and reinvest in real estate." Neither of the Leones could recall at trial having relisted Lot 15 for $7 million soon after buying it or receiving and refusing offers for it.

At the close of evidence, the Leones moved for judgment as a matter of law on Counts I and II -- the inverse condemnation claims.[9] The circuit court denied this motion.

On May 1, 2015, the parties appeared before the court to settle jury instructions. Of relevance to the issues raised on appeal, the Leones requested the following three jury instructions, which the circuit court either modified or refused.

First, the Leones requested a jury instruction (proposed Jury Instruction No. 51) on economically beneficial use:

---

[9] During the trial, the Leones voluntarily dismissed Count IV, the substantive due process claim, and Count III to the extent that it alleged a denial of equal protection. As such, the only claims remaining for the jury to determine were the inverse condemnation claims.

19

> Land has economically beneficial use, if, under the applicable regulations, all three of the following are true: (1) there is a permissible use for the land, <u>other than leaving the land in its natural state</u>, (2) the land is physically adaptable for such use and (3) there is a demand for such use in the reasonably near future.

(Emphasis added.) The circuit court modified this jury instruction (Jury Instruction No. 22) over the Leones' objection, deleting the underlined phrase "other than leaving the land in its natural state[.]" The circuit court explained that it was deleting that phrase because "this is a factual issue and better left for argument[.]"

Second, the Leones requested the following jury instruction (proposed Jury Instruction No. 73) on the burden of production:

> Plaintiffs initially bear the burden to produce evidence that they lack economically beneficial use of their property. Once Plaintiffs have produced such evidence, the burden of production shifts to the Defendants. To meet their burden of production on a proposed economically beneficial use, Defendants must produce evidence of reasonable probability that the land is both physically adaptable for such use and that there is a demand for such use in the reasonably near future.

However, the circuit court refused that jury instruction. Instead, the circuit court issued the following jury instruction on burdens (Jury Instruction No. 9): "Plaintiffs have the burden of proving by a preponderance of the evidence every element of each claim that plaintiffs assert. Defendants have the burden of proving by a preponderance of the evidence every element of each

affirmative defense that defendants assert."[10]  The circuit court explained why it modified the Leones' proposed jury instruction:

> [T]his is an issue to be determined by the Court and has been determined by the Court in terms of the motions for directed verdict and judgment by the plaintiffs and [to] instruct the jury on burdens of production would unnecessarily and potentially confuse the jury and suggest to them that the burden of proof has somehow shifted.
> Even though the words burden of production, this is a very complex area even for evidence professors at law school, and to now start to discuss all of these issues, I think, would be unduly confusing to the jurors, and also I am not sure that it's -- while it may be an accurate reflection of what the law is, it's not an accurate reflection of what has occurred in this case, based on my rulings.

Lastly, the Leones requested the following jury instruction (proposed Jury Instruction No. 71) regarding the effect of the declaration of covenants and restrictions:

> Plaintiffs' lot is subject to a declaration of covenants and restrictions ("DCR") that restricts what Plaintiffs may do with their land.  Under the DCR, Plaintiffs may use their land only for single-family residential purposes.  You may consider the DCR when determining whether Plaintiffs have any economically beneficial use of their land.

The circuit court refused this instruction.

The circuit court also issued the following relevant jury instruction:

- **Jury Instruction No. 23:**

> There is a difference between economically beneficial use and value.  A property that has value may not have "economically beneficial use."  To determine whether a defendant denied Plaintiffs economically beneficial use of their property, you may consider whether Plaintiffs were able to use their property in an economically beneficial way.

---

[10]    Additionally, Jury Instruction No. 10 explained that "[t]o 'prove by a preponderance of the evidence' means to prove that something is more likely so than not so.  It means to prove by evidence which, in your opinion, convinces you that something is more probably true than not true."

On May 5, 2015, the jury returned a verdict in favor of the County, concluding that the County had not deprived the Leones of economically beneficial use of their land.  On June 1, 2015, the circuit court entered judgment in favor of the County and against the Leones.

On August 5, 2015, the circuit court:  1) denied the Leones' June 10, 2015 renewed motion for judgment as a matter of law and, alternatively, motion for a new trial, and 2) granted in part and denied in part the County's June 12, 2015 motion for taxation of costs, awarding the County $40,522.72 in costs.

The Leones appealed and challenged the County's expert testimony, certain jury instructions, the circuit court's denial of the Leones' motion for judgment as a matter of law, and the award of costs to the County.  The County cross-appealed and filed an application for transfer of the appeal to this court, which was granted on June 29, 2016.

### III.  STANDARDS OF REVIEW

#### A.  Expert Witness Qualifications and Testimony

> [I]t is not necessary that the expert witness have the highest possible qualifications to testify about a particular manner [sic], . . . but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth. . . .  Once the basic requisite qualifications are established, the extent of an expert's knowledge of subject matter goes to the weight rather than the admissibility of the testimony.
>
> "'Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and

22

> will not be overturned unless there is a clear abuse of
> discretion.'"

Estate of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 352, 152

P.3d 504, 524 (2007) (alterations in original) (citations

omitted) (quoting Tabieros v. Clark Equip. Co., 85 Hawaiʻi 336,

351, 944 P.2d 1279, 1294 (1997)).

## B.    Jury Instructions

> When jury instructions, or the omission thereof, are
> at issue on appeal, the standard of review is whether, when
> read and considered as a whole, the instructions given are
> prejudicially insufficient, erroneous, inconsistent, or
> misleading.  Erroneous instructions are presumptively
> harmful and are a ground for reversal unless it
> affirmatively appears from the record as a whole that the
> error was not prejudicial.

Nelson v. Univ. of Haw., 97 Hawaiʻi 376, 386, 38 P.3d 95, 105

(2001) (quoting Hirahara v. Tanaka, 87 Hawaiʻi 460, 462-63, 959

P.2d 830, 832-33 (1998)).

## C.    Judgment as a Matter of Law

> It is well settled that a trial court's rulings on
> motions for judgment as a matter of law are reviewed de
> novo.
>
> > When we review the granting of a [motion
> > for judgment as a matter of law], we apply the
> > same standard as the trial court.
> > A [motion for judgment as a matter of law]
> > may be granted only when after disregarding
> > conflicting evidence, giving to the non-moving
> > party's evidence all the value to which it is
> > legally entitled, and indulging every legitimate
> > inference which may be drawn from the evidence
> > in the non-moving party's favor, it can be said
> > that there is no evidence to support a jury
> > verdict in his or her favor.
>
> Miyamoto v. Lum, 104 Hawaiʻi 1, 6-7, 84 P.3d 509, 514-15
> (2004) (internal citations omitted).

Aluminum Shake Roofing, Inc. v. Hirayasu, 110 Hawaiʻi 248, 251,

131 P.3d 1230, 1233 (2006) (brackets in original).

## IV.  DISCUSSION

Before addressing the arguments, a brief summary of the relevant law on takings provides useful context.

### A.    The Takings Clause

The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation."  This -- the Takings Clause -- is made applicable to the states through the Fourteenth Amendment.  Murr v. Wisconsin, 137 S. Ct. 1933, 1942 (2017).  Similarly, article 1, section 20 of the Hawaiʻi Constitution provides, "[p]rivate property shall not be taken or damaged for public use without just compensation."

The United States Supreme Court (Supreme Court) has established two discrete categories of government action as compensable:  physical and regulatory takings.  Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992).  The first are "regulations that compel the property owner to suffer a physical 'invasion' of his property."  Id.  The second are "regulation[s that] den[y] all economically beneficial or productive use of land."  Id.; see also Pub. Access Shoreline Haw. v. Haw. Cty. Planning Comm'n, 79 Hawaiʻi 425, 451-52, 903 P.2d 1246, 1272-73 (1995) ("A regulatory taking occurs when the government's application of the law to a particular landowner denies all economically beneficial use of his or her property without

24

providing compensation."). The relevant inquiry in the current case is whether a regulatory taking occurred.

The Supreme Court in Lucas explained that a regulatory taking occurs when the "regulation denies all economically beneficial or productive use of land." 505 U.S. at 1015 (emphasis added). The Supreme Court explained that "regulations that leave the owner of land without economically beneficial or productive options for its use -- typically, as here, by requiring land to be left substantially in its natural state -- carry with them a heightened risk that private property is being pressed into some form of public service . . . ." Id. at 1018.

More recently, in Palazzolo v. Rhode Island, 533 U.S. 606 (2001), the Supreme Court considered whether a taking could still occur even though the regulation did not deprive a landowner of all beneficial use of land. Palazzolo owned a waterfront parcel of land in Rhode Island and almost all of it was designated as coastal wetlands under state law. Id. at 611. Because of this designation, Palazzolo's development proposals for portions of his property were rejected by the Rhode Island Coastal Resources Management Council (the Council), and Palazzolo sued, claiming that the Council's application of its wetland regulations constituted a taking without just compensation. Id.

In Palazzolo, the Supreme Court expanded the rule

25

established in <u>Lucas</u> when it stated:

> Where a regulation places limitations on land that fall
> short of eliminating all economically beneficial use, a
> taking nonetheless may have occurred, depending on a complex
> of factors including the regulation's economic effect on the
> landowner, the extent to which the regulation interferes
> with reasonable investment-backed expectations, and the
> character of the government action.

<u>Id.</u> at 617 (citing <u>Penn Cent. Transp. Co. v. City of New York</u>,
438 U.S. 104, 124 (1978)).  Utilizing this test, the Supreme
Court concluded that Palazzolo was left with more than a "token
interest" in his land because of the regulations.  <u>Id.</u> at 631.
The Supreme Court explained that, while some portions of
Palazzolo's property could not be developed because of the
regulations, an upland portion of the property could be improved
and actually retained $200,000 in development value even under
the State's wetlands regulations.  <u>Id.</u> at 630-31.  As such, the
Supreme Court concluded that a "regulation permitting a landowner
to build a substantial residence on an 18-acre parcel does not
leave the property 'economically idle.'"  <u>Id.</u> at 631 (quoting
<u>Lucas</u>, 505 U.S. at 1019).

As the Supreme Court most recently noted, adjudication
of regulatory takings cases "requires a careful inquiry informed
by the specifics of the case."  <u>Murr</u>, 137 S. Ct. at 1943.
However, "[i]n all instances, the analysis must be driven 'by the
purpose of the Takings Clause, which is to prevent the government
from forcing some people alone to bear public burdens which, in
all fairness and justice, should be borne by the public as a

26

whole.'" Id. (quoting Palazzolo, 533 U.S. at 617-18).

With this framework in mind, we turn to the arguments on appeal.

## B. The Leones' Arguments on Appeal

The Leones present four points for our review. The Leones contend that the circuit court erred in: 1) denying the Leones' motion for judgment as a matter of law, 2) allowing Yamamura to testify that "investment use" is an "economically beneficial use" of land, 3) modifying Jury Instruction No. 22, refusing proposed Jury Instruction No. 73 and replacing it with Jury Instruction No. 9, and refusing proposed Jury Instruction No. 71, and 4) awarding costs to the County.

We address the second and third points first, as their resolution is helpful in considering the Leones' renewed motion for judgment as a matter of law.

### 1. The circuit court did not abuse its discretion in allowing Yamamura to testify.

The Leones take issue with the following testimony from the County's expert witness, real estate appraiser, Yamamura:

> [COUNTY:] Do you have an opinion as to whether investment is a use of land?
>
> . . . .
>
> [YAMAMURA:] I consider investment as a bona fide use of land. It happens all the time. People by [sic] land, hold on to it; after it appreciates over time, people sell it for profit. I think that's a bona fide land use.
>
> . . . .
>
> [COUNTY:] In your opinion, Lot 15 at Palauea -- based on

27

> your analysis of Lot 15 at Palauea, does it have potential
> use as an investment?
>
> . . . .
>
> [YAMAMURA:] Absolutely, yes.

The Leones argue that the circuit court abused its discretion in allowing Yamamura to testify on investment use for two reasons. First, the Leones argue that "investment use" is not an economically beneficial use as a matter of law. Second, the Leones argue that Yamamura was not qualified to opine on "economically beneficial use."

### a.    Testimony on investment use

The Leones contend that the circuit court abused its discretion in allowing the County to introduce evidence that "investment use" is an economically beneficial use of land.

While there is no Hawaiʻi legal authority on this point, there is case law from other jurisdictions that discusses this issue. For instance, in Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 95 F.3d 1422, 1425 (9th Cir. 1996) (Del Monte Dunes I), aff'd, 526 U.S. 687 (1999), the City of Monterey persistently denied Del Monte Dunes' development permits for thirty-seven ocean-front acres in which Del Monte Dunes sought to build a residential complex. Del Monte Dunes sued the City, and the jury found that the City's actions denied Del Monte Dunes equal protection and were an unconstitutional taking. Id. On appeal before the Ninth Circuit, the City argued, inter alia,

28

that it was entitled to a judgment as a matter of law on both the equal protection and inverse condemnation claims.  Id.

In arguing that the City had not denied Del Monte Dunes of all economically viable use of its property, the City noted that Del Monte Dunes sold the property to the State of California for $800,000 more than it originally paid for it.  Id. at 1432. The Ninth Circuit was not persuaded by this argument, noting that "[f]ocusing the economically viable use inquiry solely on market value or on the fact that a landowner sold his property for more than he paid could inappropriately allow external economic forces, such as inflation, to affect the takings inquiry."  Id. at 1432-33 (emphasis added).  Then, the Ninth Circuit explained that "[a]lthough the value of the subject property is relevant to the economically viable use inquiry, our focus is primarily on use, not value" and that "the mere fact that there is one willing buyer of the subject property, especially where that buyer is the government, does not, as a matter of law, defeat a taking claim." Id. at 1433 (emphases added).

Thus, Del Monte Dunes I established that, while property value should not be considered to the exclusion of other factors, it is still a relevant factor in the economically viable use analysis.  See also MacLeod v. Santa Clara Cty., 749 F.2d 541, 547 n.7 (9th Cir. 1984) ("Holding property for investment purposes can be a 'use' of property."); Fla. Rock Indus., Inc. v.

29

United States, 791 F.2d 893, 902-03 (Fed. Cir. 1986) (noting that a "qualified real estate dealer" testified that the property had "fair market value subject to the regulation" because there were "investors willing to forego immediate income in hope of long-term gain" and concluding that this was evidence of "sufficient remaining use of the property to forestall a determination that a taking had occurred"); City of San Antonio v. El Dorado Amusement Co., 195 S.W.3d 238, 245 (Tex. App. 2006) ("A restriction denies a landowner all economically viable use of the property or totally destroys the value of the property if the restriction renders the property valueless.").

In the present case, Yamamura testified that the Leones' property had "investment use" or, in other words, that the property had value because the Leones could hold on to property, wait until it increased in value, and sell it for a profit. While Del Monte Dunes I established that property value should not be the sole focus in an economically viable use inquiry, the Ninth Circuit did not foreclose the admissibility of such evidence. In fact, the Ninth Circuit noted that "the value of the subject property is relevant." Del Monte Dunes I, 95 F.3d at 1433. Thus, guidance from other jurisdictions suggests that testimony on investment use is appropriate in takings cases.

Additionally, the circuit court took mitigating measures in order to ensure that the jury did not improperly give

the "value" evidence more weight than it was legally entitled.

For example, Jury Instruction No. 23 instructed the jury that:

> There is a difference between economically beneficial use and value.  <u>A property that has value may not have "economically beneficial use."</u>  To determine whether a defendant denied Plaintiffs economically beneficial use of their property, you may consider whether Plaintiffs were able to use their property in an economically beneficial way.

(Emphasis added.)  This instruction specifically explained to the jury that the determination of whether property has any economically beneficial use does not turn on whether the property has value.

As such, we cannot conclude that the circuit court abused its discretion in allowing testimony on investment use.

### b.    Testimony on economically beneficial use

The Leones also argue that Yamamura was not qualified to opine on "economically beneficial use" and that the trial court abused its discretion in permitting him to testify on that topic.  According to the Leones, Yamamura "is an appraiser, not an economist, and his testimony should have been limited to the field of real estate appraisal."

Hawaiʻi Rules of Evidence (HRE) Rule 702 (1993) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.  In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

31

HRE Rule 702 commentary explains that "[t]he rule liberalizes the traditional common law stricture limiting expert testimony to some science, profession, business or occupation . . . beyond the ken of the average layman" and that, now, "Rule 702 requires only that the testimony be of assistance to the trier of fact."  HRE Rule 702 cmt. (1993) (ellipsis in original) (quotations and citations omitted).

In line with this rule, Hawaiʻi courts have noted that "[i]t is not necessary that the expert witness have the highest possible qualifications to testify about a particular [matter;]" instead, "the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth."  Klink, 113 Hawaiʻi at 352, 152 P.3d at 524 (quoting State v. Wallace, 80 Hawaiʻi 382, 419 n.37, 910 P.2d 695, 732 n.37 (1996)).  Additionally, "the determination of whether or not a witness is qualified as an expert in a particular field is largely within the discretion of the trial judge and, as such, will not be upset absent a clear abuse of discretion."  State v. Torres, 60 Haw. 271, 277, 589 P.2d 83, 87 (1978).

Yamamura testified to the following:  he has been a real estate appraiser for almost forty years, and that he has

32

been working for his current Maui-based firm, ACM Consultants, Inc., for approximately thirty-five years; he has been a licensed real estate appraiser in Hawaiʻi since 1991; as part of his job, he conducts real estate appraisals on "single-family residential properties, individual condominium units, improved and unimproved vacant land," as well as on commercial and industrial properties, and open space and park uses; he conducts about 200 appraisals a year, and that he is "intimately familiar with real estate on Maui"; as part of his work, he has "to determine what the best uses for those lands would be every time [he does] an appraisal"; he determines the "highest and best use[es] of the property" by conducting a "four-item test[:] that use must be legally permissible, physically possible, financially feasible, and maximally productive"; he has used this highest and best use test "in connection with thousands of properties that [he] appraised on Maui in [his] 35 years of experience."

The Leones contend that "[a]s an appraiser, Mr. Yamamura's expertise is in opining as to the value, not the use, of real property" and that Yamamura was not familiar with the term "economically viable use."  However, Yamamura's testimony establishes that he has extensive knowledge and experience in evaluating the "use" of real property.  Yamamura testified that, for over thirty-five years, he has been a real-estate appraiser on Maui and that, as part of his work, he has to determine the

"highest and best use" of the properties he evaluates. Yamamura estimated that he conducted this highest and best use test "in connection with thousands of properties . . . on Maui." Under the parameters set by HRE Rule 702 and Hawaiʻi case law, this testimony is enough to qualify Yamamura as an expert witness in this area of expertise.

As such, given Yamamura's considerable experience and expertise in appraising real property, and specifically Maui real property, the circuit court did not abuse its discretion in allowing Yamamura to testify as an expert witness.

2. **The circuit court did not err in issuing the challenged jury instructions.**

The Leones also argue that the circuit court erred in the issuance of three jury instructions. First, the Leones contend that the circuit court erroneously defined "economically beneficial use" in Jury Instruction No. 22. Second, the Leones contend that the circuit court refused to instruct the jury, per the Leones' request, on the burden-shifting paradigm in takings cases. Third, the Leones contend that the circuit court failed to instruct the jury on the effect of the declaration. Each of these arguments will be addressed in turn.

a. **Jury Instruction No. 22: economically beneficial use**

First, the Leones assert that they requested the following jury instruction on economically beneficial use:

34

> Land has economically beneficial use, if, under the applicable regulations, all three of the following are true: (1) there is a permissible use for the land, <u>other than leaving the land in its natural state</u>, (2) the land is physically adaptable for such use and (3) there is a demand for such use in the reasonably near future.

(Emphasis added.)  The Leones assert that the circuit court's Jury Instruction No. 22, which omitted the underlined text, was erroneous because "it failed to correctly state the law by omitting that such use cannot leave the land in its natural state."

The Leones' interpretation of the law on this point is too restrictive for a number of reasons.  First, a regulation could potentially require land to be left substantially in its natural state and still not be considered a taking.  It is true that case law provides that regulations that require land to be left "substantially in its natural state" <u>suggest</u> that the owner of the land is being deprived of all economically beneficial use of the land.  <u>See</u> <u>Lucas</u>, 505 U.S. at 1018 ("[R]egulations that leave the owner of land without economically beneficial or productive options for its use –- <u>typically, as here, by requiring land to be left substantially in its natural state</u> –- carry with them a heightened risk that private property is being pressed into some form of public service . . . ." (emphasis added)).  However, this rule does not state that regulations that leave land in its natural state <u>always</u> constitute a taking.  As such, Jury Instruction No. 22 is an accurate articulation of the

law.

Second, as the circuit court noted when modifying the language of the instruction, the issue of whether the government has deprived the landowners of economically beneficial use of their land is a factual query better left for the jury to decide:

> Okay. I'm familiar with the cases. I am deleting it, principally, on the grounds that I do think that, although the language is used, this is a factual issue and better left for argument, but the balance of the instruction is an accurate reflection of the law as we've discussed.

The circuit court's reasoning is in line with well-established case law. See City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 720 (1999) (Del Monte Dunes II) ("In actions at law predominantly factual issues are in most cases allocated to the jury."). Specifically, regulatory takings cases are "ad hoc, factual inquiries" that are "informed by the specifics of the case." Murr, 137 S. Ct. at 1942, 1943. As such, "the issue whether a landowner has been deprived of all economically viable use of his property is a predominantly factual question" and "is for the jury." Del Monte Dunes II, 526 U.S. at 720-21.

Accordingly, the circuit court properly instructed the jury on economically beneficial use.

### b. Jury Instruction No. 9: burden of production

Second, the Leones assert that the circuit court erred by refusing the following proposed jury instruction:

> Plaintiffs initially bear the burden to produce evidence that they lack economically beneficial use of their property. Once Plaintiffs have produced such evidence, the

> burden of production shifts to the Defendants.  To meet
> their burden of production on a proposed economically
> beneficial use, Defendants must produce evidence of
> reasonable probability that the land is both physically
> adaptable for such use and that there is a demand for such
> use in the reasonably near future.

Instead, the circuit court instructed the jury that "[p]laintiffs have the burden of proving by a preponderance of the evidence every element of each claim that plaintiffs assert."  The Leones argue that the circuit court prejudiced the Leones by not giving the requested instruction because it relieved the County of meeting its burden of production.

As support for their argument, the Leones ask us to rely on two cases from other jurisdictions: Bowles v. United States, 31 Fed. Cl. 37 (1994) and Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153 (1990).  These cases, while persuasive, are not binding on Hawaiʻi courts.  Moreover, these cases were federal bench trials and, as such, are distinguishable from this case, which was tried by a jury.  The circuit court implicitly acknowledged this distinction when it explained why it refused the proposed burden-shifting instruction:

> [To] instruct the jury on burdens of production would
> unnecessarily and potentially confuse the jury and suggest
> to them that the burden of proof has somehow shifted.
>      Even though the words burden of production, this is a
> very complex area even for evidence professors at law
> school, and to now start to discuss all of these issues, I
> think, would be unduly confusing to the jurors . . .

Additionally, even if this court were to rely on the cases cited by the Leones, the Leones' proposed jury instruction regarding burden shifting is not an accurate articulation of the

law as reflected in Bowles and Loveladies. For instance, the Leones requested that the court instruct the jury that "[p]laintiffs initially bear the burden to produce evidence that they lack economically beneficial use of their property. Once Plaintiffs have produced such evidence, the burden of production shifts to the Defendants." This proposed instruction, as written, suggests that once the Leones have produced any evidence that their property lacks economically beneficial use, they have satisfied their burden on that issue. This is incorrect. Instead, a plaintiff in a takings case must produce sufficient evidence to persuade the court that "it is more likely true than not that there remains no economically viable use for their property" before the burden shifts to the defendant.[11] Loveladies, 21 Cl. Ct. at 158 (brackets omitted); Bowles, 31 Fed. Cl. at 47. Thus, the Leones' proposed jury instruction on this topic is an inaccurate articulation of the law that they themselves rely upon. The circuit court did not err in refusing it.

> c.    **Proposed Jury Instruction No. 71: effect of the declaration**

Third, the Leones argue that the circuit court erred when it "failed to instruct the jury that the only permissible

---

[11]    And, in fact, this is what the circuit court told the jury in Jury Instruction No. 10:  "To 'prove by a preponderance of the evidence' means to prove that something is more likely so than not so. It means to prove by evidence which . . . convinces you that something is more probably true than not true." (Emphases added.)

38

economically beneficial use of the Property is as a single-family residence." The Leones explain that they requested the following jury instruction, which was refused by the circuit court:

> Plaintiffs' lot is subject to a declaration of covenants and restrictions ("DCR") that restricts what Plaintiffs may do with their land. Under the DCR, Plaintiffs may use their land only for single-family residential purposes. You may consider the DCR when determining whether Plaintiffs have any economically beneficial use of their land.

The Leones contend that "[t]he jury must consider restrictive covenants when making takings determinations." The Leones' argument here is unpersuasive for two reasons.

First, there is no authoritative legal support for the Leones' contention that a jury must be instructed on the effect of a private restrictive covenant on a regulatory takings analysis. The circuit court, in giving jury instructions, is limited to instructing the jury on the applicable law. See Tittle v. Hurlbutt, 53 Haw. 526, 530, 497 P.2d 1354, 1357 (1972) ("The function served by jury instructions is to inform the jury of the law applicable to the current case."); Udac v. Takata Corp., 121 Hawaiʻi 143, 149, 214 P.3d 1133, 1139 (App. 2009) ("The boundaries of the trial judge's discretion in informing the jury of the law applicable to the current case are defined 'by the obligation to give sufficient instructions and the opposing imperative against cumulative instructions.'" (quoting Tittle, 53 Haw. at 530, 497 P.2d at 1357)). The Leones cite to no Hawaiʻi or Supreme Court case for their contention that a jury must be

informed on the effect of private restrictive covenants.  As such, the circuit court acted well within its discretion when it refused a jury instruction not grounded in the law.

Second, the two cases relied upon by the Leones for their persuasive weight are inapposite to the issue before this court.  In both Bowles v. United States and Knight v. City of Billings, the government defendants argued that the restrictive covenants -- not their own action -- were responsible for the taking.  Bowles, 31 Fed. Cl. at 49 ("[T]he government also argues that the diminution in value of Lot 29 was somehow 'caused' by non-federal action."); Knight, 642 P.2d 141, 146 (Mont. 1982) ("We turn now to consider whether the declaration of restrictions of Lillis Subdivision limiting the use of plaintiffs' lots to residential purposes until the year 2000 prevents recovery through inverse condemnation.").  Both courts rejected this argument, determining that it was the government action, not the private restriction, that resulted in the elimination of the economically beneficial use of the property.  Bowles, 31 Fed. Cl. at 49 ("In this case it is only because of the federal government's refusal to issue a fill permit that Lot 29 has no fair market value or economically viable use.") (emphasis in original); Knight, 642 P.2d at 146 ("It is not the restrictions that are damaging plaintiffs' properties; it is the action of the City in making the improvements that is making their properties

40

nearly unusable and unmarketable for residential purposes.").
Essentially, these cases assert that the existence of a
restrictive covenant is irrelevant to a takings analysis.

Here, the Leones argue the opposite -- that "[t]he jury
must consider restrictive covenants when making takings
determinations."  (Emphasis added.)  This is certainly not the
holding of Bowles and Knight.[12]  Additionally, such a reading of
the law contravenes takings jurisprudence, which contemplates,
first and foremost, government action.  Just as the Bowles and
Knight courts determined that the existence of private
restrictive agreements cannot be used as a defense for government
actions, we similarly determine that the existence of such
private agreements cannot saddle the government with liability in
a takings analysis.  At all times in a takings analysis, it is
solely the government action that must be evaluated.

For these reasons, the circuit court did not err in
declining to instruct the jury on the effect of the declaration.

3.  **The circuit court did not err in concluding that the
    Leones were not entitled to judgment as a matter of
    law.**

Next, we must determine whether the trial court erred
in concluding that the Leones were not entitled to a judgment as
a matter of law.  The Leones assert that the evidence presented

_____

[12]  Significantly, Bowles and Knight did not touch on the issue of
whether jury instructions must include information about the existence of
restrictive covenants.

41

at trial permitted only one reasonable conclusion: the County's regulation of the Leones' property constituted a taking for which they are owed just compensation. We review a trial court's ruling on a motion for judgment as a matter of law de novo. Aluminum Shake Roofing, 110 Hawaiʻi at 251, 131 P.3d at 1233. A motion for judgment as a matter of law can be granted only when "it can be said that there is no evidence to support a jury verdict in [the non-moving party's] favor." Id. Additionally, a court must give to the non-moving party's evidence "all the value to which it is legally entitled," and to indulge "every legitimate inference which may be drawn from the evidence in the non-moving party's favor." Id.

This point on appeal presents a two-part inquiry: 1) whether the County's regulations prohibited the Leones from building a single-family residence, and, if so, 2) whether the County's regulations deprived the Leones of economically beneficial use of their land. Because the circuit court instructed the jury that the County's regulations prohibited the Leones from building a single-family residence on their property, see supra Section II.C, we need only address the second inquiry: whether there is evidence to support the jury's finding that the County did not deprive the Leones of economically beneficial use of their land.

The parties offered conflicting testimony on whether

42

the Leones' property retained economically beneficial use. The Leones' expert witnesses included Tsujimura and Dr. Whitney, who both testified unequivocally on direct examination that the County's regulations deprived the Leones of all economically beneficial use of their property. Tsujimura testified that "[b]ecause of this [community plan] inconsistency, this prevents the Leones from doing anything to start the process to do anything with the lot" and that "there's no economically beneficial use that they can use on that lot because of this." Dr. Whitney similarly testified that the community plan prohibited the Leones from building a single-family home on their property, and that this regulation prevented the Leones from realizing upwards of $19 million in value for their property.

On the other hand, the County introduced expert testimony from Yamamura, who testified on direct examination that the Leones' property had great "investment use." Yamamura testified that "investment in land" means "the use of land as an investment tool" and further explained that this occurs when "people . . . buy land, hold it for a period of time, and as it increases in value and depending on the buyer's strategy and financial objectives, sell it for profit." When asked if the property had potential as an investment, Yamamura answered, "[a]bsolutely, yes." Yamamura then explained that the property had "tremendous opportunities for increases in value[]" because

43

it was "a very scarce commodity" and "an ocean front lot on one of the best beaches in south Maui . . . ."

Indeed, the Leones' attempts at selling their property soon after buying it support Yamamura's investment use testimony. A year after purchasing the property, the Leones relisted it for $7 million, a $4 million increase in the price they paid for it, and received two offers, which the Leones eventually refused. The offers –- one for $4.5 million and the other for $4.6 million -– would have garnered the Leones, if accepted, close to $1 million in profit. Also supporting Yamamura's investment use theory is the fact that the property is included in the Leone Family Trust, which Patricia Leone conceded at trial was created, at least in part, for the purpose of "invest[ing] and reinvest[ing] in real estate." Because we have already determined that investment use is a relevant consideration in a takings analysis, see supra Section IV.B.1.a, we conclude here that the record adduces some evidence that the property retained a reasonable, economically viable use, specifically in the form of an investment.

In addition to Yamamura's testimony about investment use, there is also some evidence to support the County's contention that the property had economically beneficial use in the commercial context. For instance, on cross-examination, Tsujimura conceded that the Leones could potentially conduct

commercial activities on their property as a park. Additionally, on cross-examination, Dr. Whitney similarly conceded that point, and also conceded that he did not undertake any research to determine whether commercial activity on the Leones' property was economically viable.

As such, there is evidence to support the jury's finding that the property retained some economically beneficial use. Although the Leones were prevented from building a single-family residence on the property, evidence was presented showing that the property had value as an investment property and could potentially be used in the commercial context as well. See Penn Cent., 438 U.S. at 130 ("[T]he submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable.").

In sum, we conclude that there is evidence to support the jury's verdict that the County's regulations did not amount to a taking of the Leones' property. See Aluminum Shake Roofing, 110 Hawaiʻi at 251, 131 P.3d at 1233 ("A [motion for judgment as a matter of law] may be granted only when . . . it can be said there is no evidence to support a jury verdict in [the non-moving party's] favor." (first brackets in original) (emphasis added)). Accordingly, the circuit court did not err in denying the Leones'

motion for judgment as a matter of law.[13]

4.   **The circuit court did not err in awarding costs to the County.**

The Leones argue that the circuit court erred in awarding costs to the County because the County is not the "prevailing party" under Hawaiʻi Rules of Civil Procedure (HRCP) Rule 54(d).  This argument is contingent on this court's decision to vacate and remand this case on the grounds the Leones raised in the previous sections.  Because we affirm the circuit court's judgment, the Leones' argument that the circuit court erred in awarding costs to the County is unavailing.

C.   **The County's Arguments on Cross-appeal**

Because we rule in favor of the County, we may quickly dispense with its cross-appeal.  In its cross-appeal, the County raises seven points for our review.  The Leones argue that the County's cross-appeal is not permitted by law because the County is not an aggrieved party.

"Generally, the requirements of standing are (1) the person must first have been a party to the action; (2) the person seeking modification of the order of judgment must have had standing to oppose it in the trial court; and (3) such person must be aggrieved by the ruling."  Waikiki Malia Hotel, Inc. v.

---

[13]   The Leones also contend that they are entitled to a judgment as a matter of law on their civil rights act claim.  Because we affirm the circuit court's judgment that a taking did not occur, we need not address the Leones' civil rights argument here.

Kinkai Props. Ltd. P'ship, 75 Haw. 370, 393, 862 P.2d 1048, 1061 (1993) (emphasis added).  This court defines an aggrieved party in the civil context "as 'one who is affected or prejudiced by the appealable order.'"  Id. (quoting Montalvo v. Chang, 64 Haw. 345, 351, 641 P.2d 1321, 1326 (1982)).  Thus, under the general rule, the County is not an aggrieved party and would not be able to appeal its case.

However, as this court noted in City Exp., Inc. v. Express Partners, 87 Hawaiʻi 466, 468 n.2, 959 P.2d 836, 838 n.2 (1998), "[w]hile the general rule is that a prevailing party may not file a direct appeal, there is an exception for cross-appeals."  This court specifically determined that "[i]f the appellate court reverses the ruling of the lower court, then it must address any relevant issues properly raised on cross-appeal."  Id.  In Express Partners, because we affirmed the circuit court's directed verdict in favor of the cross-appellants, we concluded that the cross-appeal was moot.  Id.

Similarly, because we affirm the circuit court's judgment in favor of the County, we find its cross-appeal moot.

**V.  CONCLUSION**

For the foregoing reasons, we affirm the circuit court's:  1) June 1, 2015 judgment in favor of the County and against the Leones, 2) August 5, 2015 order denying the Leones' renewed motion for judgment as a matter of law or, in the

47

alternative, motion for a new trial, and 3) August 5, 2015 order

granting in part and denying in part the County's motion for

costs.

Andrew V. Beaman,                    /s/ Mark E.  Recktenwald
Leroy E. Colombe,
and Daniel J. Cheng                  /s/ Paula A. Nakayama
for plaintiffs-appellants/
cross-appellees                      /s/ Sabrina S. McKenna

Patrick K. Wong, Brian A.            /s/ Richard W. Pollack
Bilberry and Thomas Kolbe
for defendants-appellees/            /s/ Michael D. Wilson
cross-appellants

